UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | |
|---|---|
| ASHTYN WILLIAMS as the Personal Administrator of the ESTATE OF MALCOLM WILLIAMS, | ) ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Case No. 4:21-cv-00068-TWP-KMB ) |
| CLAY BOLEY, | ) ) |
| Defendant. | ) ) |

### ENTRY ON PLAINTIFF'S MOTION *IN LIMINE* TO EXCLUDE EXPERT TESTIMONY

This matter is before the Court on Plaintiff Ashtyn Williams', as the Personal Administrator for the Estate of Malcolm Williams ("Plaintiff"), Motion to Exclude Expert Molinaro-Ryan Report (Filing No. 98). Plaintiff seeks to limit Defendant Clay Boley's ("Trooper Boley" or "Defendant") experts, Howard J. Ryan, Jr. ("Mr. Ryan") and James P. Molinaro ("Mr. Molinaro), from testifying about certain issues at trial. For the reasons stated below, the Court **grants in part and denies in part** Plaintiff's Motion.

### I. FACTUAL BACKGROUND

In the early morning of April 28, 2020, Trooper Boley pulled over a vehicle for having a broken taillight in which Mr. Williams was the passenger and his nine-months pregnant girlfriend, Antoinette Webb ("Ms. Webb"), was driving (Filing No. 1 at 3). At some point during the traffic stop, Mr. Williams agreed to be checked for weapons and Trooper Boley found a 9mm magazine in Mr. Williams' back pocket (the parties dispute whether Mr. Williams disclosed it, or Trooper Boley found it). Mr. Williams apologized and stated that he had forgotten it was there. Trooper Boley asked him where the gun was, and Mr. Williams stated it was at home. Trooper Boley asked

Mr. Williams to sit back in the passenger seat and close the passenger car door with the window still open so that Mr. Williams could comfort Ms. Webb who was in labor. The remaining factual background is highly disputed. It is Defendant's position that Mr. Williams pulled a gun from the glovebox and shot at Trooper Boley for no reason. According to Defendant's narrative:

> Mr. Williams turns towards Trooper Boley and stares at him, says something to Trooper Boley, reaches into the glove compartment, and pulls out a pistol with an extended magazine. Trooper Boley tells Mr. Williams to "stop." Mr. Williams begins to retract his hand from Trooper Boley, with the gun pointed towards the window. Trooper Boley grabs the gun as it reaches the car window to secure it in a "catcher's grip." Mr. Williams and Trooper Boley both have their hands on the gun as the gun is pushed out the car window. Trooper Boley sees a flash from the end of the barrel and feels the gun cycle. As Trooper Boley continues to try to gain leverage to get the gun out of Mr. Williams's possession, he feels the gun fire again. At that point, Trooper Boley reaches for his own pistol and fires six rounds into Mr. Williams's torso. Ms. Webb jumps from the car after hearing the gunshots. Trooper Boley is treated at a hospital for minor scrapes after the incident.

(Filing No. 72 at 5.)

According to Plaintiff, as Mr. Williams "attempted to hand the handgun to the police officer, by holding it in a way that clearly demonstrated that he could not shoot the handgun, Defendant Boley fatally shot him at least six times. Most of those shots hit [Mr. Williams] in the back." (Filing No. 1 at 4.) Crime scene investigators collected three shell casings from the vehicle allegedly identified as being shot from Mr. Williams' 9mm gun. (Filing No. 72 at 6.) Mr. Williams died the next morning as a result of his gunshot wounds, and now his half-sister, Ashtyn Williams, brings this suit. *Id*. at 6).

After this suit was initiated, the Defendant retained Mr. Molinaro and Mr. Ryan of Highlands Forensic Consulting LLC as expert witnesses in this case, and they co-authored the Crime Scene Review, Analysis and Reconstruction report (the "Molinaro-Ryan Report") in anticipation of trial. (Filing No. 114-1.) Both experts opine that "[t]he physical evidence from the scene, Buick Lacrosse, Trooper Clay Boley, and Mr. Malcolm Williams provide findings which

are consistent with the description of events and actions described and taken by Trooper Clay Boley which resulted in the shooting death of Mr. Malcolm Williams." *Id*. at 15. Based on their observation of photographs of the injuries to Trooper Boley, they opine that "[a] blackish discoloration consistent in appearance with gunshot residue (GSR) is visible on the right forearm of Tpr. Boley and directly adjacent are a number of small hemorrhagic marks consistent in appearance with stippling. *Id*. at 7 (footnotes omitted).

On June 16, 2023, Plaintiff filed the instant motion to limit testimony concerning the Molinaro-Ryan Report (Filing No. 98). The Defendant filed a response opposing Plaintiff's Motion and the Plaintiff replied (Filing No. 114; Filing No. 115). The Court previously entered an Order denying Plaintiff's Motion *in Limine* No. 2 objecting to Defendant's disclosure of the joint Molinaro-Ryan Report (Filing No. 116 at 7-9).

## II. LEGAL STANDARD

Under Federal Rule of Evidence 702 and the principles of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, a district court judge is to act as a "gatekeeper" for expert testimony, only admitting such testimony after receiving satisfactory evidence of its reliability. 509 U.S. at 589 (1993); *Krik v. Exxon Mobil Corp.*, 870 F.3d 669, 673 (7th Cir. 2017). Under Rule 702,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *see also Ortiz v. City of Chi.*, 656 F.3d 523, 536 (7th Cir. 2011).

In performing its gatekeeper role under Rule 702 and *Daubert*, "the district court must engage in a three-step analysis before admitting expert testimony. It must determine whether the

3

witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). In other words, the district court must evaluate: (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. *Id*. The proponent of the expert bears the burden of demonstrating by a preponderance of the evidence that "the expert's testimony would satisfy the *Daubert* standard." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). District judges possess considerable discretion in dealing with expert testimony. *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990).

### III.   DISCUSSION

In her Motion, Plaintiff seeks to limit the Molinaro-Ryan's "Opinions" that certain factual matters actually occurred must be excluded; that "Molinaro-Ryan cannot testify that Boley was consistent while Webb was not"; Molinaro-Ryan should be barred from discussing a "rapidly unfolding dynamic shooting event," and "though they should be barred altogether, if permitted, only one expert can be allowed." (Filing No. 98 at 9-11). She asserts that the Molinaro-Ryan Report impermissibly "purports to decide, *as a factual matter*, that (1) Malcolm Williams fired three shots; (2) there is gunshot residue in the images of Boley; and (3) that there was actually stippling on Boley." (Filing No. 98 at 6.)

**A.   Experts' Testimony About Stippling and Gun Shot Residue ("GSR")**

The Plaintiff argues that Mr. Molinaro and Mr. Ryan are not qualified to testify that there was "actually GSR or stippling in the images" taken of Trooper Boley, following the incident, because they lack the expertise to do so. (Filing No. 98 at 7.) As for qualifications, the question

4

is not whether the expert is generally qualified in his or her field, but whether the expert has the necessary education and training to draw the conclusions he or she offers in the case at hand. *See Hall v. Flannery*, 840 F.3d 922, 926 (7th Cir. 2016). Experts may testify on the basis of practical experience as well as on the basis of formal education. "While 'extensive academic and practical expertise' in an area is certainly sufficient to qualify a potential witness as an expert, *Bryant v. City of Chicago*, 200 F.3d 1092, 1098 (7th Cir. 2000), 'Rule 702 specifically contemplates the admission of testimony by experts whose knowledge is based on experience,' *Walker v. Soo Line R. Co.*, 208 F.3d 581, 591 (7th Cir. 2000)." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

Here, both experts have extensive experience in crime scene investigations and reconstruction (Filing No. 114-1). Mr. Ryan has,

> [O]ver twenty-seven years of investigative and crime scene experience in active law enforcement and eight years in the private sector as a consultant in criminal and civil matters in crime scene investigation and reconstruction. I will utilize my knowledge, training, and experience together with multiple specialized courses to include the disciplines of shooting and bloodstain analysis, death and homicide investigations, scene processing and evidence evaluation and CAD diagraming to reconstruct the events and dynamics for the incident which resulted in the death of Mr. Malcolm Williams. I teach crime scene investigation and crime scene reconstruction and shooting incident reconstruction for the University of Tennessee, National Forensic Academy and privately for Forensic Training Source, LLC which requires me to remain current and up to date on advancements in the above investigative fields.

(Filing No. 114-1 at 2).

On the other hand, Mr. Molinaro has,

> [O]ver thirty-four years of investigative experience in active law enforcement and six years in the private sector as a consultant in criminal and civil matters in crime scene investigation and crime scene reconstruction. I will utilize my knowledge, training, and experience together with multiple specialized courses to include the disciplines of shooting analysis, death and homicide investigations, forensic pathology, scene processing and evidence evaluation to reconstruct the events and dynamics for the incident which resulted in the death of Mr. Malcolm Williams. I

5

teach crime scene investigation and crime scene reconstruction and shooting incident reconstruction for the University of Tennessee, National Forensic Academy and privately for Forensic Training Source, LLC which requires me to remain current and up to date on advancements in the above investigative fields.

(Filing No. 114-1 at 2). The Court is satisfied that both experts are qualified in the field of crime scene investigations and reconstructions.

The Molinaro-Ryan Report provides definitions for both gunshot residue and stippling:

Gunshot Residues are the total residues resulting from the discharge of a firearm. It includes both propellant and primer residues, carbonaceous material plus metallic residues from projectiles, fouling and any lubricant associated with the bullets (Source: Shooting Incident Reconstruction, Lucien C. Haag).

Stippling are small hemorrhagic marks on the skin produced by the impact of gunpowder particles and/or the embedding of partially consumed and unconsumed powder particles in the skin with accompanying hemorrhagic marks associated with living skin (Source: Shooting Incident Reconstruction, Lucien C. Haag).

(Filing No. 114-1 at 7 footnotes 1 and 2).

Plaintiff, argues that "[a]s to stippling, this is a *medical* determination someone like a forensic pathologist—a medical doctor—must make, not something for a retired police officer with no medical training to provide." (Filing No. 98 at 7.) [1] Plaintiff also argues that neither Mr. Molinaro nor Mr. Ryan should be allowed to testify that there was GSR on Trooper Boley's uniform because they have not "proffered [any] evidence that, as former police officers, they have been trained in the specialized field of gunshot residue analysis." *Id*. at 8. Plaintiff relies on *United States v. Lee* to support her latter argument. 502 F.3d 691, 698 (7th Cir. 2007) (affirming exclusion of police officer proffered as GSR expert where they lacked specialized training and skill in GSR).

---

[1] *See, e.g., Laux v. Mentor Worldwide, LLC*, 295 F. Supp. 3d 1094 (C.D. Cal. 2017) (chemist without medical training was not qualified to offer medical opinions); *In re Silicone Gel Breast Implants Prod. Liab. Litig.* 381 F. Supp. 2d 879, 913 (C.D. Cal. 2004) (a toxicologist without medical training was not qualified to testify on specific medical causation or individual diagnosis); *In re Breast Implant Litig.*, 11 F. Supp. 2d. 1217, 1243 (D. Colo. 1998) (biomaterials expert without medical training excluded from offering any opinion concerning a disease's causation, mechanism, or effects); *Sanderson v. Int'l Flavors Fragrances, Inc.*, 950 F. Supp. 981, 1001 (C.D. Cal. 1996) (neuropsychologist without medical training is not qualified to testify as an expert on toxic causation).

In *Lee*, the proposed expert had an associate degree in police science, had worked as a law enforcement officer for 14 years, and upon leaving law enforcement, had started his own business that focused on homicide scene reconstruction. *Id*. at 698. The expert wanted to offer testimony on "how gunshot residue can transfer from one surface to another and how gunshot residue found only on the right cuff of Lee's jacket suggests that he had not recently fired a gun." *Id*. The Seventh Circuit in affirming the district court's exclusion of the proffered testimony noted that the expert was not qualified because "he had never been asked to conduct testing for purposes of ascertaining the properties or characteristics of gunshot residue and that he had neither the training nor experience necessary to conduct the actual testing of an object for the presence of gunshot residue." *Id*.

Here, both expert opinions regarding the appearance of GSR on Trooper Boley's uniform and stippling or bruising on his arm will be limited. Like *Lee*, neither expert was asked to conduct testing to determine whether GSR was actually present on Trooper Boley's clothing or persons, nor have they demonstrated that they are qualified to do such testing.[2] Therefore, neither expert will be allowed to opine or conclude *as a matter of fact* that the purported stippling or bruising was caused by actual GSR or testify *as a matter of fact* that GSR was present on Trooper Boley's uniform (Filing No. 115 at 5).

Instead, considering both Mr. Molinaro's and Mr. Ryan's extensive academic and professional/technical training and experience in crime scene investigations and reconstructions, including crime scene and forensic science (Filing 114-1 at 28), the Court is persuaded that they possess the necessary knowledge and skill to testify based on their observations, that certain

---

[2] Plaintiff's request for a *Daubert* hearing "as it relates to the 'opinions' about stippling and gunshot residue, both of which Molinaro and Ryan lack the qualifications to opine about" (Filing No. 115 at 2), is **denied** as moot. As explained in this Order, the Court agrees that the witness may not testify that there was *actually* GSR or stippling in the images, and the witness testimony on this issue will be limited.

photographs depict injuries consistent with what appears to be stippling or bruising caused by GSR meeting the skin.  They may also opine, based on their training and experiences, on whether the dark stains or smudges on Trooper Boley's uniform appear to be GSR.  Again, neither expert can definitively say that GSR was present on Trooper Boley's person and clothing because they did not conduct the required testing nor expressed the capability to conduct such testing.  Accordingly, the Court **grants in part** Plaintiff's Motion as set forth above.

B.      <u>**Undue Prejudice and Rapidly Unfolding Dynamic Shooting Event**</u>

Plaintiff asks the Court to exclude Defendant's experts from opining that "certain facts did in fact occur would be unfairly prejudicial to Plaintiff and violate Rule 403" because "Malcolm Williams—who is deceased—will not be able to tell the jury what happened (and testify that he did not shoot at Boley)." (Filing No. 98 at 8-9.) She also contends, "the purported factual conclusion that Malcolm Williams fired a gun…supplants the jury's role on an ultimate issue in the case…". (Filing No. 98 at 6.)  Plaintiff also asks the Court to prevent the experts from using "police jargon like calling this a 'rapidly unfolding dynamic shooting event'" because it is inappropriate legal conclusion (Filing No. 115 at 7).  The Court finds all three arguments baseless.

Rule 403 requires the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...." Fed. R. Evid. 403.  "Unfair prejudice ... means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one." Advisory Committee's Notes on Fed. R. Evid. 403, cited approvingly in *Old Chief v. United States*, 519 U.S. 172, 184–85 (1997).  Although experts may provide opinions as to the ultimate factual issues in a case, *U.S. v. Pansier*, 576 F.3d 726, 738 (7th Cir. 2009), they may not testify "as to legal

8

conclusions that will determine the outcome of the case" under Rule 702. *Good Shepherd Manor Found. v. City of Momence*, 323 F.3d 557, 564 (7th Cir. 2003).

Here, the Court fails to see how an expert using the phrase "rapidly unfolding dynamic shooting" could lead anyone, let alone a reasonable jury, to determine the level of force used by Trooper Boley. The phrase arguably suggests the circumstances surrounding the shooting but does not in any way imply the level of force used by Trooper Boley. Any concern that police jargon may confuse the jury can easily be cured by asking the witness to explain its meaning.

Similarly, the Court fails to see any prejudice to Plaintiff, especially since Mr. Williams' girlfriend, Ms. Webb, was present at the scene and is set to testify at trial. It is well understood that experts do not reach their conclusions with 100% certainty and in their report, Mr. Ryan and Mr. Molinaro do not contend that "certain facts did in fact occur." Rather, they explain "[t]he findings contained in this report are accurate within a reasonable degree of professional certainty" (Filing No. 114-1 at 19). Experts are allowed to make reasonable conclusions based upon the information provided to them and are allowed to testify regarding their opinions on factual issues. It is Plaintiff's job, during cross examination, to poke holes in the experts' conclusions or opinions and not the Court's role to exclude opinions that the Plaintiff dislikes. Merely disagreeing with an expert's conclusion is no basis for excluding their testimony. *See Daubert*, 509 U.S. at 595 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Therefore, the Court **denies** Plaintiff's Motion in this regard.

C.   **Credibility Argument**

Plaintiff next asserts that "[a]n expert offers no helpful testimony if it starts from the assumption that a certain event occurred as proof that the event occurred, [] which is exactly what

9

happened here."  (Filing No. 98 at 6.)  Plaintiff argues the experts are impermissibly offering credibility testimony by stating that Trooper Boley's statements were consistent, while Ms. Webb's statements were inconsistent throughout the Molinaro- Ryan Report. *Id*. at 9.

It is well-settled that determining the weight and credibility of witness testimony is the exclusive province of the jury and that experts are not permitted to offer opinions as to the believability or truthfulness of that testimony. *See United States v. Hall*, 165 F.3d 1095, 1107 (7th Cir. 1999). The reason for this general rule is that, rather than helping the jury "to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702(a), such testimony usurps the jury's role by "wrap[ping] the lay witness in the expert's prestige and authority." *See Giuffre v. Jefferson*, 2017 WL 951239, at *2 (N.D. Ill. Mar. 10, 2017) (barring expert from "offering an opinion as to Plaintiff's state of mind or motive during the events on July 11, 2013" because the "opinion reli[es] in primary part upon the assumption that Defendants' account is accurate.").

Neither expert is opining that Trooper Boley's statements are more truthful than Ms. Webb but merely that one statement is consistent with the evidence. Neither expert is purporting to offer testimony regarding Mr. Williams' or Ms. Webb's state of mind. Both experts offered their opinions after assessing the physical evidence, Ms. Webb's and Trooper Boley's statements throughout the case, and the documents related to certain investigations (Filing No. 114-1). The experts independently reached their opinions based upon the materials provided to them by Defendant. Moreover, Defendant stipulates that its "counsel can instruct his experts to not opine as to the credibility of the witnesses, which resolves Plaintiff's concern here." Therefore, the Court **denies** Plaintiff's Motion in this regard. Plaintiff is free to renew her objection at trial.

10

**D.     Only One Expert Allowed**

Finally, Plaintiff seeks to preclude having two experts testify to the same thing. (Filing No. 98 at 11, Filing No. 115 at 2.)  During the final pre-trial conference held on July 5, 2023, Defendant advised that he only intends to call Mr. Ryan to testify concerning the Molinaro-Ryan Report.  So this request is **denied as moot**.

## IV.     CONCLUSION

As set forth above, the Court **GRANTS in part and DENIES in part** Plaintiff's Motion *in Limine* (Filing No. 98).  An order *in limine* is not a final, appealable order, rather they are preliminary and "subject to change when the case unfolds" because actual testimony may differ from a pretrial proffer. *Luce v. United States*, 469 U.S. 38, 41 (1984).  A trial judge does not bind himself by ruling on a motion *in limine* and "may always change his mind during the course of a trial." *Ohler v. United States*, 529 U.S. 753, 758 n.3 (2000).  If a party believes that evidence excluded by this Order becomes relevant or otherwise admissible during the course of the trial, counsel may request a hearing outside the presence of the jury.  Likewise, if the parties believe that specific evidence is inadmissible during the course of the trial, counsel may raise specific objections to that evidence.

SO ORDERED.

Date:   8/2/2023

Hon. Tanya Walton Pratt, Chief Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

Arthur Loevy
LOEVY & LOEVY
arthur@loevy.com

David B. Owens
LOEVY & LOEVY
david@loevy.com

Jonathan I. Loevy
LOEVY & LOEVY
jon@loevy.com

Mark Loevy-Reyes
LOEVY & LOEVY
mark@loevy.com

Steven E. Art
LOEVY & LOEVY
steve@loevy.com

Gustavo Angel Jimenez
OFFICE OF THE INDIANA ATTORNEY GENERAL
gustavo.jimenez@atg.in.gov

Hannah Lynette Hulsey
OFFICE OF THE INDIANA ATTORNEY GENERAL
hannah.hulsey@atg.in.gov

James Michael Sedam
OFFICE OF THE INDIANA ATTORNEY GENERAL
James.Sedam@atg.in.gov